**DURANGO ASSOCIATES, INC.,
DND Corporation**

v.

**REFLANGE, INC., Climax
Manufacturing.**

**Civ. A. No. H–81–696.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 13, 1986.

As Amended Feb. 27, 1986.

Guy E. Matthews, Houston, Tex., for plaintiffs.

James S. Leigh, Klarquist, Sparkman, Campbell, Leigh, Whinston & Dellett, Portland, Or., Fay E. Morisseau, Vinson & Elkins, Houston, Tex., for Climax Mfg.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### I.

### *Introduction*

This is an action for patent infringement. Plaintiffs, Durango Associates, Inc. ("Durango") and DND Corporation ("DND"), charged defendant Reflange, Inc. ("Reflange") with infringement of United States Patent Nos. 3,762,246 ("'246 Patent") and 3,772,944 ("'944 Patent") in the above-referenced cause of action. Climax Manufacturing Company's ("Climax") motion to intervene as a party defendant was granted in 1983. Reflange is a former distributor for Climax, and the accused devices are the models FF 618 and LFF 1840 portable flange facing machines manufactured and sold by Climax.

Defendant Climax counterclaimed for a declaratory judgment that (1) the patents in suit are invalid and, if valid, (2) the patents in suit are not infringed. Plaintiffs initially alleged that the Climax 618 and 1840 flange facers infringed claims 1, 3, and 7 of the '246 Patent and claim 1 of the '944 Patent. Plaintiffs withdrew their allegations at trial that claims 1 and 7 of the '246 Patent were infringed by either the Climax 618 or 1840 flange facers, and that the Climax 1840 flange facer infringed claim 3 of the '246 Patent. The only remaining claims are that the 618 flange facer infringes claim 3 of the '246 Patent, and that the 618 and 1840 flange facers infringe

claim 1 of the '944 Patent. Since Climax's counterclaim asserts noninfringement of claims 1, 3, and 7 of the '246 Patent and claim 1 of the '944 Patent, however, the infringement of all claims is at issue, as is the validity of such claims by reason of the same counterclaim.

## II.

### Findings of Fact

A. *The Parties To This Lawsuit*

1. Plaintiff DND is a Delaware corporation and owner of record of the patents in suit. Admission of Fact.

2. Plaintiff Durango is a Texas corporation having a place of business in Houston, Texas, and is the exclusive licensee of the patents in suit. Admission of Fact.

3. Defendant Climax is an Oregon corporation having a place of business in Newberg, Oregon. Admission of Fact.

4. Defendant Reflange is a Texas corporation having a place of business in Houston, Texas. Admission of Fact.

5. Defendant Climax manufactures and sells the accused Model 618 and Model 1840 flange facers. It has sold such flange facers to Defendant Reflange. Admission of Fact.

6. Defendant Reflange is a former distributor of the accused flange facers for Climax. Such distributorship relationship ended before the commencement of this lawsuit. Admission of Fact.

B. *History of This Dispute*

7. In 1975, Climax made the decision to market a portable flange facing machine. Testimony of Benham. At that time, Climax consulted a patent lawyer, Mr. Schermerhorn, and requested him to make a patentability and infringement investigation based on a preliminary drawing of a portable flange facer, and brochures of four companies already marketing flange facers in this field. Testimony of Benham; Deposition of Schermerhorn (DX–75; DX–106); DX–71; DX–72; DX–70; DX–52; DX–53; DX–73.

8. In October 1975, the patent lawyer reported the results of his investigation. DX–51. The '246 and '944 Patents in this suit (DX–1, DX–2) were among those found in the investigation. Also found in the investigation were a number of other patents, including the patent to Henderson (PX–89). The patent lawyer advised Climax that none of the patents found in the search would be infringed by the proposed Climax design. DX–51; Testimony of Benham.

9. In August, 1976, Climax received a notice from DND's vice-president, C. Richard Sherer, regarding Climax's apparent infringement of one or more of the claims of the '246 and '944 Patents. DX–55.

10. Climax's president, Leroy Benham, responded and stated that it was not Climax's intention to infringe, indicated that it was consulting with patent counsel, and invited a meeting in Houston. Testimony of Benham; DX–57.

11. Without ordering or analyzing the file histories of the patents in suit, Climax's patent lawyer advised Climax that its design did not infringe the patents in suit, and detailed the reasons supporting his opinion of non-infringement. (Testimony of Benham; DX–56; DX–58; DX–60). Those reasons are the same reasons relied upon today by Climax in its defense of non-infringement of the patents in suit. Testimony of Benham.

12. In September, 1976, Mr. Benham advised Mr. Sherer that Climax's patent attorney had assured him that Climax was not infringing the patents in suit. DX–91E; Testimony of Benham.

13. In early 1978, Climax received a letter from DND's patent attorney, Mr. Wilson, again notifying Climax of its apparent infringement of the '246 and '944 Patents. DX–59. Climax's patent lawyer responded by denying such infringement and requesting more specific information.

14. Mr. Schermerhorn notified Mr. Benham that Mr. Wilson's infringement charge was vague and tentative, and might be just a bluff. (DX–61; Testimony of Benham). However, the "Declaratory Judgment Act" was also discussed, and Mr. Benham under-

stood the reason for the language in the notice of infringement letters, which was necessary to avoid creating an actual controversy within the State of Oregon. Testimony of Benham.

15. In 1980, Durango's patent lawyer, Mr. Matthews, notified Reflange of its apparent infringement of the '246 and '944 Patents by reason of its sale of the Climax portable flange facers. Testimony of Benham; DX–62; DX–63; DX–64.

16. In 1981, the present action was commenced by Plaintiffs against Reflange. Fearing the adverse effects of a possible judgment of patent infringement against Reflange for its sale of Climax flange facers, and learning of Reflange's limited resources, Climax moved to intervene as a defendant to protect its interests. Testimony of Benham; Motion to Intervene and supporting Memorandum and Affidavits.

C. *The Patents In Suit*

17. The '246 Patent, entitled FLANGE FACING MACHINE, was issued on October 2, 1973 from an application filed July 2, 1971. The patent names Anthony F. Becker as the sole inventor. The patent is assigned to DND. The patent includes eight claims. Only claim 3 is asserted by Plaintiffs to be infringed. DX–1; Admission of Fact.

18. The '944 Patent, entitled FLANGE FACING MACHINE, was issued on November 20, 1973 from an application filed January 3, 1972. The patent names Anthony F. Becker, Charles R. (C. Richard) Sherer, and three others as co-inventors. The patent is assigned to DND. The patent includes only single claim 1, which is asserted by Plaintiffs to be infringed. DX–2.

19. Plaintiff Durango is the exclusive licensee under both the '246 and '944 Patents. Testimony of Richard Sherer.

20. Asserted claim 3 of the '246 Patent reads as follows:

3. A flange facing machine for facing a flange on a tubular member, comprising:

a base adapted to fit within the bore of a tubular member having a flange thereon which is to be faced;

a support column separate from and mounted on said base;

means for releasably attaching said support column to said base;

attachment means for releasably securing said base to the inner wall of the tubular member;

a rotable frame mounted on said support column for rotation relative thereto;

a facing tool secured to said rotatable frame for rotational movement therewith;

power means for rotating said rotatable frame;

means operable in response to the rotation of said rotatable frame for automatically and continuously feeding said facing tool substantially radially with respect to the bore of the tubular member as said tool is rotated; and

said means for attaching comprising means for expanding said base internally of said support column after said base has been aligned relative to the tubular member for thereby locking said support column to said base in alignment therewith and with the tubular member.

21. Asserted claim 1 of the '944 Patent reads as follows:

1. A flange facing machine for facing a flange on a tubular member, comprising:

a tubular support column having a base therewith adapted to fit within the bore of a tubular member having a flange thereon which is to be faced;

attachment means for releasably securing said base to the inner walls of the tubular member;

a rotatable tubular frame mounted on and surrounding said support column for rotation relative thereto and extending for substantially the full length of said support column;

a facing tool secured to said rotatable frame for rotational movement therewith;

power means for rotating said rotatable frame;

means operable in response to the rotation of said rotatable frame for automatically and continuously feeding said fac-

ing tool substantially radially with respect to the bore of the tubular member as said tool is rotated;

a power means support cap disposed at the upper end of said support column; and

a single bolt vertically disposed and extending into the bore of said support column and releasably secured thereto to attach said support cap and power means to said support column, said bolt having an external diameter approximately the same size as the internal diameter of said bore of said support column.

22. Plaintiffs' flange facers are adapted to be mounted and aligned within the bore of a flanged pipe or valve in the field for resurfacing the flange. A portion of the machine projecting outwardly beyond the bore of the flanged pipe or valve carries a rotatable housing with a radial tool-holding arm mounting a cutting tool. As the housing rotates generally about the axis of the bore, the cutting tool on the radial arm rotates in cutting engagement with the flange surface. A feed mechanism causes the radial arm and thus the cutting tool to move generally in a radial direction on the flange as it rotates, thereby machining a smooth, flat face on the flange. Testimony of Sherer; PX–5; PX–6.

23. The applications for the '246 and '944 Patents were co-pending in the Patent Office and filed only a few months apart in 1971 and 1972, and the two patents were issued in late 1973. Much of the disclosures of both patents are identical. PX–5; PX–6.

24. In addition to disclosing everything in the '246 Patent, the '944 Patent adds a second embodiment, as shown in Figs. 8–19 of its drawings and described in the latter portions of its detailed description. PX–6.

25. The features shown in Fig. 3 of the '246 Patent indicate a flange facer which has a base (tubular base 20), a separate support column (25), and means for releasably attaching the support column (25) to the base (20). The means for releasably attaching the support column to the base is in the form of means for expanding the base (tapered threaded plug 26) inter-

nally of the support column (25) after other attachment means (screw clamps 21) have releasably attached the base (20) to the tubular member (flanged pipe P) and after the base (20) has been aligned (using alignment device B of Fig. 4) relative to the tubular member (P), for thereby locking the support column (25) to the base (20) in alignment with the base (20) and the tubular member (P). Figure 3 thus reveals a flange facer capable of a two-step installation in the bore of a flanged pipe (P). First the base (20) is attached and aligned in the bore of flanged pipe (P). Then the column (25) is attached to the base (20) by expanding the base (20) within the column (25). DX–43; PX–5, claim 3, Fig. 3, Column 2—lines 31–61, Column 5—lines 6–32.

26. Claim 1 of the '944 Patent is embodied by a flange facer shown in Figs. 8–19 beginning at Column 8, line 60 of said patent which reveals a flange facer having a base (120), a tubular support column (125), and a rotatable tubular frame (131) mounted on the support column (125). A power means support cap (167) is attached to the column (125) by a single bolt (163) extending into the bore of the column (125) and secured to the column. That is, the single bolt (163) is threaded into the bore of the column (125). For this purpose, the single bolt (163) has threads (163a) which mate with internal threads (125g) within the bore of the column (125). PX–6, Fig. 10, Column 10—lines 39–51, claim 1—lines 10–16; DX–44.

27. Both claim 3 of the '246 Patent and claim 1 of the '944 Patent also require a facing tool (For example DX–1, DX–2, Item C, Figs. 1–2) secured to the rotatable frame (R), and a feed means operable in response to rotation of rotatable frame (R) for automatically and continuously feeding the facing tool (C) substantially radially. Testimony of Sherer; PX–84, Fig. C; DX–5, Column 6—lines 14–32; DX–6.

D. *Prosecution History of '246 Patent, Claim 3*

28. The '246 application as originally filed had a single independent claim, appli-

cation claim 1, which broadly claimed the combination of a flange facer (1) mounted in the smooth bore of a flanged pipe, and (2) having means responsive to the rotation of the rotatable frame for automatically and continuously feeding a cutting tool radially with respect to the bore of the flanged pipe. PX–3. In his first office action, the Examiner rejected application 1 as being anticipated by the Henderson patent (PX–89). PX–3. Testimony of Sherer; Testimony of Reiter.

29. Claim 3 of the '246 Patent was derived from original application claims 1, 2, and 7. Original application 2 depended from original application claim 1. Original application claim 7 depended from application claim 2 and further defined the means for releasably attaching the support column to the base called for in claim 2 as including:

> means for expanding said base internally of said support column after said base has been aligned relative to the tubular member for thereby locking said support column to said base in alignment therewith and with the tubular member. [PX–3].

30. Original application claim 2 was also rejected by the Examiner as being anticipated by the Henderson patent (PX–89). However, claim 7 was deemed allowable by the Examiner if amended. PX–3. Accordingly, applicant rewrote application claim 7 as application claim 15. PX–3, pp. 32–33, 36. As a result of such amendment, application claim 15 was allowed and became patent claim 3. PX–3.

E. *Prosecution History of '944 Patent Claim 1*

31. Sole claim 1 of the '944 Patent was derived from original application claims 18 and 20. PX–4.

32. Original application claim 20 depended from original application claim 18 and added the following requirements:

> a power means support cap disposed at the upper end of said support column; and
>
> a single bolt vertically disposed and extending into the bore of said support

column and releasably secured thereto to attach said support cap and power means to said support column, said bolt having an external diameter approximately the same size as the internal diameter of said bore of said support column. [PX–4, p. 52].

33. In support of the patentability of original application claim 20 over the cited Henderson patent (PX–89), the applicants' attorney, Mr. Pravel, remarked as follows:

> Claims 19 and 20 are dependent from claim 18 and define further differences over the Henderson patent ...

> Claim 20 is directed to a specific feature of the present invention relating to the mounting of the power means utilizing a single bolt at the upper end of the support column. This unique and unobvious arrangement provides the strength and support necessary to support a motor or power means on the support column in a position for driving the tubular frame. There is no comparable structure in the Henderson, et al. patent and therefore claim 20 is submitted to be allowable along with claim 18 and the other claims. PX–4, p. 56.

34. The Patent Examiner continued to reject original application claim 18 on prior art, but indicated that original application claim 20 would be allowable if rewritten in independent form to include the limitations of its rejected parent claim. PX–4, p. 58. Application claim 18 was amended to include the two additional paragraphs of claim 20, and thereafter was allowed and became claim 1 of the '944 Patent. PX–4.

35. The unique and unobvious arrangement referred to by Plaintiffs' patent counsel is the structure for supporting the power means on the column, which is not disclosed in Henderson. In Henderson, the power support cap was supported by a rotatable collar which lies between the support cap and the cone. Figure 1 of the Henderson patent reveals that the rotatable member (L) could not rotate between the collar (U) and the cone (F) when the nut (V) was tightened sufficiently to render the

entire device stable enough to cut a flange. PX–98; PX–89; Testimony of Sherer.

36. Thus, a significant difference between the Henderson reference cited and claim 1 of the '944 Patent is that the power means support cap in the '944 Patent is disposed at the upper end of the support column, and is releasably secured thereto. Testimony of Sherer; Testimony of Reiter.

### F. *The Accused Climax Flange Facing Machines*

37. Climax has made and sold two models of portable, bore-mounted flange facers since the '246 and '944 Patents issued—the Climax models FF 618 and LFF 1840. The construction and operation of the original model have remained essentially the same. (DX–10; Testimony of Benham). Both models are shown and described in their respective operating manuals (DX–15, 16) in the Hunt affidavit (DX–10) with reference to Climax drawings (DX–11, DX–11A, DX–12, DX–12A), in photographs (DX–13A–I), and in Climax drawings. (DX–40; DX–54; DX–82; DX–83; DX–84; and DX–85). The construction and operation of the accused Climax 618 flange facer were also described in detail at trial with reference to an actual Climax 618 flange facer. DX–50; Testimony of Hunt.

38. The model 618 is designed to be mounted within smaller bores and to reface smaller diameter flanges than the model 1840. A structural difference of significance between the two models is the provision of remote chuck jaw adjustment screws and associated actuating rods in the model 618 which enable it to be clamped in a flange pipe bore and properly adjusted from the top of the machine. (DX–11A). In contrast, the chuck jaws of the larger model 1840 must be adjusted at the base within the flanged pipe bore. Testimony of Benham; Testimony of Hunt.

39. Both the 618 and 1840 models have the same basic drive mechanism for rotating the rotatable housing, and both have the same basic cam-actuated, step-type tool feed mechanism which feeds the cutting tool radially in an outward direction as it rotates around a flange. Testimony of Benham; Testimony of Hunt.

40. The drive mechanism of the 618 and 1840 is a continuous drive in that the cam follower of both models is continuously in contact with the cam, at least at the highest rate of speed. Testimony of Hunt; Testimony of Sherer.

41. Both the accused 618 and 1840 flange facers have a base or "chuck" (24) and an essentially solid support column (11) which are connected together at the factory by screws (25) threaded up through the bottom of the base or chuck into the bottom of the support column or "spindle" (11). The base and column are mounted and aligned as a unit within a bore of a flanged pipe (19) to be refaced by jaws (5), or threaded clamping screws in the case of 1840, projecting laterally from the base (24) against the inner wall of the flanged pipe (19). Testimony of Hunt; DX–11A.

42. Still referring to DX–11A, clamping jaws (5) of the 618 flange facer are urged into clamping contact with the inner wall of flanged pipe (19) by vertical actuating rods (3) and (4) extending within the support column (11) and base (24). Beveled lower end surfaces of rods (4) contact correspondingly beveled surfaces of clamping jaws (5). Screws (1) and (2) threaded into small tapped holes in the top of support column (11) push rods (3) and (4) downward, forcing clamping jaws (5) outward against the inside wall of flanged pipe (19). Small set screws (23) extending laterally into lower portions of column (11) and base (24) project into recesses in rods (4) to prevent the actuating rods (3) and (4) from dropping out through the bottom of base (24) but without preventing the rods (3) and (4) from moving a sufficient distance to actuate jaws (5). Set screws (23) function as limit stops for rods (3) and (4). In addition to simply limiting the downward movement of the rods, however, the set screws serve the purpose of aligning the rods within the bore. Testimony of Hunt; Testimony of Sherer; Testimony of Reiter. DX–50; DX–11A.

43. A rotatable housing or frame (10) is mounted for rotation on the support column (11). A motor support flange (8) surrounds and is fixed to the support column (11) by a split taper lock bushing (9). The taper lock bushing (9) is unthreaded, and attaches the motor support flange to the outside of support column (11). Support flange (8) carries a drive motor (31) which rotates the rotatable housing (10) through a pinion gear (6) on its drive shaft and an internal ring gear (7) at the upper end of the rotatable housing (10). Testimony of Hunt; DX–50; DX–11A.

44. As the housing (10) rotates, a cam follower roll (14) carried at the lower end of a ratchet arm (33) in the rotatable housing (10) engages a cam surface (22) on the base of the support column (11) to cause the ratchet arm (33) to oscillate as it rotates with the housing (10). The ratchet arm is pivoted at its upper end to a gear shaft through a one-way clutch mechanism indicated generally at (21). The clutch mechanism operates in such a way that as the ratchet arm (33) oscillates under the influence of the cam (22), the clutch grips the gear shaft to turn it through a small angle only when the ratchet arm moves in one direction. Thus, a gear carried by the gear shaft (C) and other connected gears of a gear train on other shafts (A, B, D) are rotated through a small angle periodically only in one direction. One of the gears of the gear train (on shaft A) engages a gear rack (12A) on a tool arm (12) to cause the tool arm and a flange-cutting tool (26) carried by the arm to move outwardly in a substantially radial direction intermittently in steps twice per revolution of the rotatable housing (10). The tool feed mechanism described is unidirectional, feeding from the inside to the outside of a flange face, regardless of the direction of rotation of the rotatable housing (10). Testimony of Hunt; DX–50; DX–11A. Also see DX–10; DX–12–A; DX–13A–I; DX–15; DX–16; DX–40; DX–54; DX–82; DX–83; DX–84; DX–85; and Deposition of Hunt (DX–80).

45. Although Climax has received recognition for its innovative marketing techniques, and has captured a monopoly of the market through obtaining a patent on another portable tool, defendants responded evasively to the question of why they had not sought to patent the accused flange facers, even though a novelty search was conducted. Testimony of Benham; Deposition Testimony of Strait (DX–76).

46. Climax had access to, and utilized plaintiffs' brochures in designing its own flange facers, and attempted to design around the literal requirements of the patents in suit. Testimony of Benham; Deposition Testimony of Strait (DX–76).

G. *Infringement of the '246 Patent*

47. Defendants contend that they avoid infringement of Claim 3 of the '246 Patent due to the following:

(a) The accused Climax device does not have a "means operable in response to the rotation of said rotatable frame for automatically and continuously feeding said facing tool substantially radially ..."

(b) The accused Climax device does not have a support column separate from and mounted on said base.

(c) The accused Climax device does not have "said means for attaching comprising means for expanding said base internally of said support column after said base has been aligned relative to the tubular member for thereby locking said support column to said base in alignment therewith and with the tubular member";

Testimony of Benham; DX–56.

48. Defendants would limit plaintiffs' claim to a continuous spiral-type radial feed mechanism (PX–84, Fig. C), and exclude the intermittent step-type cam-operated radial feed mechanism shown in the defendants' device. (PX–84, Fig. B). Defendants did not elicit expert testimony regarding this issue, and it was essentially conceded during trial that the accused devices include an automatic and continuous feed mechanism. (Testimony of Hunt; Stipulation of Counsel). Thus, plaintiffs' testimony on this point is entitled to appropriate weight. Testimony of Sherer; Testimony of Reiter.

49. Defendants' machine operates "substantially radially" within the meaning of Claim 3 of the '246 Patent, despite the slight "kick-out" which occurs at 180° intervals as the housing and tool rotate. Testimony of Sherer; Testimony of Reiter.

50. Relying upon specifications, Defendants would further limit Plaintiffs to claiming a device that requires a two-step installation, apparently in support of its contention that the accused devices do not include a "support column separate from and mounted on said base." This Court finds said contention to be without merit. PX–5; Testimony of Sherer; Testimony of Reiter.

51. Although the testimony is sharply conflicting, having weighed the credibility of the witnesses and observed the defendants' machine, this Court finds that the "means for expanding said base internally of said support column" applies, with reference to DX–11A, to the rods (3)(4) and screws (1)(2) inside the support column (11) for forcing the clamping jaws (5) in the base (24) out against the inner wall of the flanged pipe (19) to be refaced. Thus, the rods (3)(4), together with the set screws (23) at the base of the column (11) and in the base (24) act as releasable attaching means for attaching the column to the base and further comprise the equivalent of "means for expanding said base internally of said support column" as is required by Claim 3. It is not only the bottom screws (25) which attach the base (24) to the support column (11), but also the set screws (23), and the rods (3)(4) which act to expand the jaws (5) against the inner wall of the flanged pipe (19). Thus, there is a cooperative relationship between the set screws (25), the expanding jaws (5), and the push rods (3)(4) whereby the push rods expand into the base (24). This constitutes a simple reversal of parts which does not escape infringement. DX–11A; PX–92. Testimony of Reiter; Testimony of Hunt.

52. The push rods act against the expanding jaws to move them outwardly to lock the jaws to the interior of the flange bore. The base, support column and flange are locked together at the top by the allen head screws and at the bottom by the jaws. In addition, the set screws (23) provide a vector force inward on the push rods to provide a fulcrum force about which the inward force of the jaws act, further locking the support column and base to the flange. Thus, the attachment means (25) lock the base and support column together, but the push rods and expanding jaw provide the "means for expanding," and further lock and align the base, support column and flange member. DX–11; PX–92; Testimony of Sherer; Testimony of Reiter.

53. Accordingly, I find that each element of claim 3 of the '246 Patent, or its equivalent, is contained in the FF 618 flange facing machine.

54. Plaintiffs have proffered no evidence in response to defendants' counterclaims of noninfringement of claims 1 and 7 of the '246 Patent.

55. Plaintiffs have also proffered no evidence in response to defendants' counterclaim of noninfringement of claim 3 of the '246 Patent by the Climax 1840 flange facer.

## H. *Infringement of the '944 Patent*

56. Defendants contend that they avoid infringement of claim 1 of the '944 Patent due to the following:

(a) The accused devices do not have a "means operable in response to the rotation of said rotatable frame for automatically and continuously feeding said facing tool substantially radially . . .";

(b) The accused devices do not have a "tubular" support column, or a "rotatable tubular frame mounted on and surrounding said support column for rotation relative thereto and extending for substantially the full length of said support column";

(c) The accused devices do not have "a single bolt vertically disposed and extending into the bore of said support column and releasably secured thereto to attach said support cap and power means to said support column . . ." Testimony of Benham; Testimony of Hunt; Testimony of Medlock; DX–56.

57. This Court's findings relative to the automatic and continuous feed mechanism of defendants' devices apply with equal force relative to the '944 Patent and will not be reiterated.

58. Although the support columns contained in defendants' devices are essentially solid, they are unquestionably the equivalent of the tubular support column claimed in the '944 Patent. Testimony of Sherer; Testimony of Reiter.

59. The rotatable frames of the accused devices extend for "substantially" the entire length of the support column, which is readily observed in Defendants' Exhibits 11 and 12. Testimony of Sherer.

60. The accused devices do not have a single bolt. It is therefore clear that Climax's flange facers do not literally infringe Claim 1 of the '944 Patent. Consequently, testimony is most sharply divided regarding the presence of an equivalent structure, and on the issues of file wrapper estoppel and the appropriate range of equivalents. Compare Testimony of Sherer; Testimony of Benham; Testimony of Reiter; Testimony of Medlock.

61. Having examined defendants' device, assessed the credibility of the witnesses, reviewed the conflicting evidence and argumentation, and considered the file history of the '944 Patent, as well as the prior art references, this Court determines that the tapered split ring bushing which is placed over the support column and forced against the support cap using set screws to rigidly attach the support cap to the support column performs substantially the same function, in substantially the same manner, to achieve substantially the same result as the single bolt of Claim 1 of the '944 Patent. Testimony of Sherer; Testimony of Reiter.

62. The testimony of defendants' expert witness was that the single bolt was the only patentable "feature" of Claim 1. Testimony of Medlock. In contrast, plaintiffs' expert witness testified that it was not the single bolt which distinguished claim 20 from Henderson (PX–89), but as the argument of plaintiffs' patent counsel indicates, it was the "arrangement which provides the strength and support necessary to support the power means on the support column" which was not anticipated by Henderson. The Henderson reference actually discloses a single bolt, which further supports Plaintiffs' testimony that it was the "arrangement" or the totality of Claim 1 which was allowed by the patent examiner. Testimony of Reiter; Testimony of Sherer, PX–4. Thus, patent counsel's argument during prosecution of the claim does not support the narrow interpretation urged by defendants; he did not argue the importance of the single bolt "feature" but rather the arrangement of supporting the power cap on the column. Testimony of Reiter. PX–4, page 56.

63. There was no evidence presented by Defendants to the effect that the taper lock bushing of the accused devices is not the equivalent of the single bolt. Rather, the testimony of defendants' expert witness was that such an interpretation would read on Henderson. Testimony of Medlock.

64. A finding that the taper lock bushing is an equivalent device, however, does not read upon Henderson because Henderson does not rigidly fix its support cap to the column by any means. Testimony of Reiter; Testimony of Sherer.

65. File wrapper estoppel does not preclude a finding that defendants' devices incorporate an equivalent structure since Original Claim 18 of the '944 Patent Application had no fastening means whatsoever. Consequently, the specific means cited in Claim 20 is not a limiting factor as to the means for attaching the power support cap to the support column. PX–4; Testimony of Reiter.

66. The function of the single bolt described in Claim 1 is to hold the support cap to the column, especially when the flange facing machine is used in the inverted position. Thus, the support of the cap by the column at the upper end of the support column provides additional stability not provided in Henderson. Testimony of Sherer.

67. The split lock bushing and set screws in the accused devices achieve sub-

stantially the same result by attaching the power support flange to the spindle to allow a stable rigid mounting of the power means on the column. Testimony of Sherer; Testimony of Reiter.

68. The expander plug of Plaintiffs' device achieves the function of rigidly attaching the power means to the spindle by wedging itself in place. Thus, the friction between the two surfaces provides added strength for holding the base and column together. PX-4.

69. The split lock taper bushing performs in substantially the same manner as the single bolt of Plaintiffs' claim. Like the expander plug, it is wedge shaped and operates on the same principle—the wedge shape provides greater friction than would be allowed by a non-tapered bushing. Consequently, Defendants' taper lock bushing utilizes the exact same principle as does Plaintiffs' single bolt.

70. The absence of threads, and the position of the tapered lock bushing on the outside of the column are insignificant. Testimony of Sherer; Testimony of Reiter.

71. Accordingly, this Court finds that each element of Claim 1 of the '944 Patent, or its equivalent, is contained in the FF 618 and the FF 1840 flange facing machines.

I. *Prior Art*

72. A flange is a connecting apparatus between two pieces of pipe or between a pipe or vessel using bolts. In service, flange facers become pitted or scored causing flanges to leak. Periodically, flanges must be unbolted so that the sealing surface can be refinished. Testimony of Sherer.

73. The flange facing machines of the '246 and '944 Patents were the first flange facers developed and marketed by Plaintiffs. Testimony of Sherer.

74. Portable, bore-mounted flange facing machines were not new with the '246 and '944 Patents; they were known as early as 1873 in the Henderson Patent. (PX-89). Other portable, bore-mounted flange facers representative of the prior art are shown by the Payne Patent 2,478,310 (DX-7), Turner Patent 1,832,923 (DX-8), Ander-

son Patent 1,973,597 (DX-9), and Rennie British Patent 749,258 (DX-31).

75. Other representative prior art portable flange facers include those shown in Richey Patent No 2,736,995 (DX-20); British Patent 885,592 (DX-21); and British Patent 1,107,090 (DX-67).

76. The Henderson patent (PX-89) most closely resembles the flange facers of the '246 and '944 Patents. With reference to Fig. 1 of Henderson and DX-45, Henderson shows a portable flange facing machine having a hollow base (C) adapted to fit within the smooth bore of a tubular flanged pipe (A).

77. The Henderson patent discloses a support cap (U) which is supported by the frame (L), and is therefore not disposed at the upper end of the support column as required by claim 1 of the '944 Patent, and as is shown in Defendants' devices. The power means support cap (U) of Henderson is not secured to the upper end of the support column (F) by a single bolt threaded into the support column or any other equivalent device as is required by claim 1 of the '944 Patent, but rather is secured by a single bolt (B) and nut (V), which is supported by the rotatable frame (L). Testimony of Sherer; Testimony of Medlock; Testimony of Reiter; PX-3; PX-4; PX-5; PX-6.

78. The British patents cited above, (DX-21) (DX-67), the Richey Patent, and the Turner and Anderson Patents, also cited above, were neither cited to the Patent Office by the Plaintiffs nor cited by the Patent Office. PX-3; PX-4.

79. Alleging that the patents "speak for themselves," Defendants have provided this Court with a "shopping list" of uncited references. Curiously, Defendants failed to elicit testimony from any witness regarding such patents' teachings.

80. Thus, this Court designates appropriate weight to the unequivocal testimony of Plaintiffs' expert witness that none of the uncited references admitted into testimony by the Defendants are more perti-

nent than the Henderson reference. Testimony of Reiter.

81. The admission into evidence of numerous patents by the Defendants without any effort to elicit direct testimony regarding the patents' teachings is apparently in support of their contentions that the Plaintiffs' claims represent "narrow inventions in a crowded art," which are limited to the narrowest range of equivalents, and which must be strictly interpreted. Although Plaintiffs' patents are clearly "improvement" patents (PX–5; PX–6), without the aid of expert testimony, defendants' position leaves for the Court to divine whatever thesis is being advanced, rather than presenting clearcut evidence upon which this Court could rely in making a proper determination. Presumably, any defendant in a patent infringement suit could utilize similar tactics.

82. While others recognized the need for a compact portable flange facer, Plaintiffs developed and successfully marketed an internally mounted flange facing machine that was both portable and effective. Testimony of Sherer.

83. Although Plaintiffs' invention includes a combination of well known principles (Deposition Testimony of Strait, DX–6; Deposition Testimony of Gilmore, PX–29), Plaintiffs' device met with almost immediate commercial success. Testimony of Sherer.

84. The early sales of Plaintiffs' flange facing machines, and the subsequent sales of Defendants' machines, show a response within the industry (Testimony of Sherer; Testimony of Benham), which indicates that the patents in suit represent an improvement over prior art.

J. *Level of Skill in the Art*

85. The relevant art to be considered in determining the question of obviousness or nonobviousness of the claimed inventions under 35 U.S.C. § 103 is the art of designing portable machine tools, such as portable flange facing machines. Deposition of Gilmore (PX–24, DX–105); Deposition of Strait (DX–76; DX–107).

86. The claimed inventions of the patents in suit must be presumed to have been made in 1971 in the case of the '246 Patent, and in 1972 in the case of the '944 Patent, the filing dates of the applications. No evidence was introduced as to any earlier invention date.

87. Defendants' contention is that the level of skill of a person having ordinary skill in the art of designing portable machines tools, including flange facing machines, in 1971 and 1972 was "relatively high." Deposition of Guy Gilmore (PX–24, DX–105); Deposition of Paul Stait (DX–76, DX–107). However, Defendants offered no direct testimony on this point.

88. Taking the deposition testimony in the light most favorable to Defendants, there is no credible evidence to support a finding that the combination of elements found in the patents in suit would have been obvious to a person having ordinary skill in the art of designing flange facers. The ambiguous deposition testimony offered into evidence only supports a finding that Plaintiffs' patented devices utilize some principles or elements which were well known in the art of designing flange facers at the time of the invention. Deposition of Gilmore (PX–24; DX–105); Deposition of Strait (DX–76, DX–107).

89. Similarly, Plaintiffs presented scant evidence relative to a finding of obviousness. However, Plaintiffs' expert witness did testify that the patent examiner is more highly skilled than the ordinary person skilled in the art of designing flange facing machines. Testimony of Reiter.

90. In light of the evidence admitted and testimony elicited, this Court is not compelled to make additional findings regarding the level of skill in the art of designing flange facers.

K. *Damages*

91. The demand for the patented product in the marketplace is established by the sales of Defendants' and Plaintiffs' machines. Defendant Climax made over 600 total sales of the accused devices since 1975. PX–80.

92. From 1971 to 1974, Plaintiffs had sales of between 1.25 and 1.50 million dollars. After the introduction of Defendants' devices, Plaintiffs' sales fell dramatically. Testimony of Sherer.

93. Plaintiffs have the capacity to manufacture and supply the demand for the patented product. Testimony of Sherer.

94. Concerning the detailed computation of lost profits, the number of machines sold by Defendant Climax was 372 for the FF 618 and 238 for the FF 1840. (PX–80). Plaintiffs' Series II flange facing machine is the equivalent in the marketplace of the FF 618, and Plaintiffs' Series III is equivalent to the Defendants' model LFF 1840. Plaintiffs' profit on the Series II machine is $13,100.00 for each machine sold; Plaintiffs' profit on the Series III machine is $20,175.00 for each machine sold. Testimony of Sherer.

95. Defendants have raised a post-trial objection to Plaintiffs' method of computing lost profits, asserting that there is no evidence regarding variable costs. Defendants further assert that Plaintiffs' evidence consists wholly of oral testimony without supporting documentation. Since Plaintiff's method of computing lost profits was not challenged at the time of trial, however, Plaintiffs' essentially uncontroverted oral testimony is accorded appropriate weight. Thus, the Court finds that Plaintiffs' lost profit due to the sale of the accused devices is $9,665,850.00. Testimony of Sherer.

96. Plaintiffs' testimony concerning the absence of an acceptable substitute in the marketplace for the patented device is highly controverted. (Compare Testimony of Sherer; Testimony of Benham). Defendant Climax asserts that there are existing acceptable substitutes; that the market is highly price sensitive; that the disparate prices of the respective devices preclude a finding that Plaintiffs would have made the sales made by Defendants if there had not been competing infringing devices. Testimony of Benham.

97. Having considered all of the evidence, and assessed the credibility of the witnesses, the Court finds that there are no acceptable substitutes in the marketplace for Plaintiffs' patented device. (Testimony of Sherer). This finding is supported even by the evidence adduced by Defendants. Although various flange facers are preferred for different purposes, none of the machines alleged by Defendants to constitute acceptable, noninfringing substitutes is capable of performing all of the applications of Plaintiffs' and Defendants' devices. Testimony of Sherer; Deposition Testimony of Kelsey, DX–81; DX–108.

98. Furthermore, Climax estimates that it has captured between 50–60% of the relevant market. (Testimony of Benham). Together with Plaintiffs' sales, this establishes a substantial share of the market despite the existence of other machines which can be adapted to perform some similar functions. Testimony of Sherer; Testimony of Benham.

99. Although the testimony of Defendants' witness that the market is highly "price sensitive" is supported by the dramatic decrease in Plaintiffs' sales subsequent to the introduction of Defendants' devices, (Testimony of Benham; Testimony of Sherer), it does not follow that Plaintiffs cannot assume that they would have made all of the sales made by Defendants in the absence of the infringing substitute. Furthermore, the determination that the market is "price sensitive" could not even have been made without the presence in the marketplace of Defendants' devices.

100. While Defendants' machines are preferred for some purposes due to their compact size (Deposition of Kelsey, DX–81), Plaintiffs' devices are unquestionably superior in design. (PX–5; PX–6); the bi-directional rotation and spiral-feed features of Plaintiffs' devices produce a smoother resurfacing. (Testimony of Sherer; Testimony of Hunt). While Defendants may not have sold as many machines at Plaintiffs' prices (Testimony of Benham), because the Court finds that Defendants' machines are relatively inexpensive copies of the Plaintiffs' machines, which add nothing to the prior art, the Court does not find Defendants' testimony probative on the issue of

whether Plaintiffs could have made the sales made by Defendants in the absence of an inexpensive, infringing substitute.

101. Perhaps, most telling on the issue of whether there is a two supplier market is the testimony that Defendants contacted several companies including Reekie, Gilmore, and Matra to attempt to work out a marketing proposal, but did not contact Plaintiffs because Defendants had determined that it would not have been prudent to enter into an arrangement with a direct competitor in the same market. Testimony of Benham.

102. Although Plaintiffs have adduced evidence which could support a finding of negligence (PX–27K; PX–27L), such evidence is insufficient to support a finding that the Defendants' infringement was willful and wanton. Furthermore, the Court finds that this is not an exceptional case which would warrant an award of attorneys' fees.

103. In addition to lost profits, prejudgment interest is also appropriate.[1] Thus, the Court finds that prejudgment interest in the amount of ten (10) percent per year for two years is adequate to compensate for the loss of Plaintiffs' monies. Said amount is $1,933,170.00.

104. Accordingly, total actual damages sustained by Plaintiffs as a consequence of Defendants' infringement of the patents in suit are $11,599,020.00.

## II.

### Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. § 1338(a). Venue is proper in this Distruct pursuant to 28 U.S.C. § 1400(b) in that Reflange has a regular and established place of business in this District and has committed acts alleged to infringe the patents in suit within this District. Plaintiff DND and Defend-

ant Climax have voluntarily appeared in this District.

2. The Court also has jurisdiction over the subject matter of Defendant Climax's declaratory judgment counterclaim under 28 U.S.C. §§ 1338(a); 2201 and 2202, being an action which arises from an actual controversy between the parties. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c).

■ 3. Plaintiff DND is the owner through assignment of the patents in suit. Plaintiff Durango is the exclusive licensee under the patents in suit. Thus, Plaintiffs have standing to bring this action.

### Validity

4. An invention must satisfy the standards established in section 101, 102 and 103 of the Patent Act, 35 U.S.C. §§ 101–103, to be patented.

■ 5. As an initial matter, the Court notes that the patents in suit, like all patents properly issued, are entitled to a presumption of validity. 35 U.S.C. § 282. The burden of showing invalidity of the patents therefore rests upon the Defendants in this case. 35 U.S.C. § 282. Furthermore, the presumption of validity is never annihilated or weakened regardless of the factual evidence presented. Rather, the presumption of validity is a procedural device which assigns the burden of proving invalidity to the challenger. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534, 218 U.S.P.Q. 871, 875–76 (Fed.Cir. 1983); *ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1575 (Fed.Cir. 1984)

■ 6. The challenger's introduction even of *more* pertinent prior art than that considered by the examiner does not weaken or destroy the presumption of validity, although it would require one supporting

---

1. The Court observes that plaintiffs have presented evidence which reasonably establishes their right to recover actual damages pursuant to the authorities cited herein. *See* Conclusions of Law 28–32. Plaintiffs elected not to present evidence pertaining to the alternative method of computing damages based upon a reasonable royalty. Similarly, defendants did not present countervailing evidence relevant to a determination of damages based upon a reasonable royalty.

validity to come forward with countervailing evidence. *See Stratoflex, Inc., supra,* at 1534.

7. Under section 102 of the Patent Act, all of the material claimed features of the patent must be contained in a single prior art reference to be "anticipated." *Steel Casing v. Delwood Furniture Co., Inc.,* 578 F.2d 74 (5th Cir.), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1978).

8. Since there are clearly no references which anticipate the claims of the patents in suit under 35 U.S.C. § 102, the key issue with respect to validity becomes the issue of nonobviousness under 35 U.S.C. § 103.

9. This Court has been directed to apply the standards articulated in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), in determining the issue of validity. *Graham's* three-pronged test requires inquiry into the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art.

10. Claims are to be construed in light of the specifications and the prosecution history of the patent. *Fromsom v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570–71, 219 U.S.P.Q. 1137, 140–41 (Fed. Cir.1983). Furthermore, claims should be construed, if possible, so as to sustain their validity. *Carman Indus. Inc. v. Wahl,* 724 F.2d 932, 937 n. 5, 220 U.S.P.Q. 481, 485 n. 5 (Fed.Cir.1983).

11. This Court is mindful of the Federal Circuit Court's opinion in *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 (Fed.Cir. 1983), wherein the Court stated that there is no classification entitled "combination patents" because "virtually every invention is a combination of elements or process steps ..." *Id.* at 1549. Thus, it is not "features" but the subject matter of the invention "as a whole" which must be considered. *Id.*

12. Even if "distinguishing features" are disclosed in prior art, the statutory test of obviousness is not met because "obviousness cannot be established by combining the teachings of the prior art to pro-

duce the claimed invention, absent some teaching or suggestion supporting the combination." *ACS Hosp. Systems, Inc., supra,* at 1577.

13. The test in the § 103 nonobvious determination is whether a person of ordinary skill in the art, having all of the teachings of the prior references before him, would be able to produce the invention defined by the claim. *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1013 (Fed.Cir.1983).

14. Applying the relevant law to the facts in this case, this Court observes that the evidence submitted by Defendants on the aforesaid critical issues consists solely of uncited prior art references and ambiguous deposition testimony. No trial testimony was elicited in support of invalidity from any witness concerning the scope and content of the prior art, the differences between the prior art and the claims at issue, or the level of ordinary skill in the pertinent art. With reference to the Henderson patent, Defendants' expert witness testified only that the claims of the patents in suit must be narrowly interpreted to uphold validity. Although the burden of proof has been described as a heavy one which must meet the clear and convincing level, *see, e.g., Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir.1975), *cert. denied* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976); *Connell v. Sears, Roebuck, supra,* at 1542, this Court concludes that Defendants have failed to meet their burden of proof on the issue of invalidity, even if the traditional preponderance of evidence standard were to be applied.

14a. Aided by the presumption of validity, Plaintiffs had no burden of coming forward with evidence. However, the presumption of validity has been strenghtened by the trial testimony in this case including the uncontroverted testimony of Plaintiffs' expert witness that none of the uncited references admitted into evidence by the Defendants are more pertinent than the cited Henderson reference.

15. Moreover, this Court has been instructed to consider certain secondary factors when determining the issue of validity. *Graham v. John Deere*, 383 U.S. 1, at 35–36, 86 S.Ct. 684, at 702–03, 15 L.Ed.2d 545. Thus, the presumption of validity in this case has been strengthened by the Plaintiffs' evidence concerning commercial success, and by the infringers' initiation of copying only after the patentee established commercial success.

16. The specific combination of elements shown in the '246 and '944 Patents has not been disclosed in the prior art. Furthermore, such specific combination would not have been obvious to one of ordinary skill in the art of designing flange facing machines at the time of Plaintiffs' invention. Accordingly, the Court concludes that the properly issued '246 and '944 Patents at issue in this case are clearly valid.

## Infringement

17. Patent infringement is the unauthorized making, using or selling of an invention covered by a valid claim of a patent during the life of the patent. 35 U.S.C. § 271. Plaintiffs have the burden of proving infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 U.S. P.Q. 473, 480 (Fed.Cir.1983). This burden extends to infringement under the doctrine of equivalents as well as to literal infringement. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1984).

18. In considering infringement, the Court must first consider the claims of the patent read in the light of specifications, because the scope of every patent is limited to the invention described in its claims. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 U.S. P.Q. 1137, 1140 (Fed.Cir.1983). Claim construction generally involves examining the specifications, prosecution history, and other claims. *Lemelson, supra* at 1549.

19. It is well settled that each element of a claim is material and essential and that in order to make out infringement, the plaintiff must show the presence of each and every element of a claim or its substantial equivalent in the accused device. *Autogiro Co. of America v. United States*, 384 F.2d 391, 403, 181 Ct.Cl. 55, 155 U.S.P.Q. 697, 707 (1967). If the accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Graver Tank & Manu. Co., Inc. v. Linde Air Products*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

20. The doctrine of equivalents comes into play only when actual literal infringement is not present. The doctrine of equivalents was judicially developed to protect a patentee from devices that incorporate insignificant modifications but which perform substantially the same function in substantially the same way to obtain substantially the same result. *Garver Tank, supra* at 608, 70 S.Ct. at 856.

21. Application of the doctrine of equivalents may be curbed by the invocation of the doctrine of file wrapper estoppel. In sum, an inventor may not later recapture through the doctrine of equivalents that which has been eliminated from the claims during prosecution in the Patent Office, if claims are narrowed, surrendered or amended to meet the obligations of the patent examiner. *Graham v. John Deere Co.*, 383 U.S. at 33, 86 S.Ct. at 701. However, estoppel only applies to that which was surrendered.

22. Some courts have expressed the opinion that any amendment of claims results in a file wrapper estoppel which is effective to bar the doctrine of equivalents and to confine a patentee to the strict letter of the claims granted. Such a position, as the *Hughes* Court points out, "fails to recognize that the doctrine of equivalents is unnecessary when literal infringement is present, and is contrary to the guidance provided by the Supreme Court in *Garver*," *Hughes Aircraft Co.*, 717 F.2d at 1362.

23. In *Autogiro, supra* at 400–01 the court recognized that the doctrine of equivalents is subservient to file wrapper estoppel. "Thus, a patent that has been severely limited to avoid the prior art

will only have a small range between it and the point beyond which it violates file wrapper estoppel." *Id.* Consequently, the range of equivalents which Plaintiffs are entitled to claim is limited by the pertinent prior art references. *Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 942, 220 U.S.P.Q. 481, 489 (Fed.Cir.1983).

24. In recognition of the fact that the patents in suit would be worthless against devices such as Defendants' which incorporate insignificant modifications but function in substantially the same way to produce substantially the same result, this Court accords Plaintiffs an appropriate, narrow range of equivalents. This Court is aware of the prior art limitations and the file histories of Plaintiffs' patents. This Court realizes that Plaintiffs' continuation applications of both patents narrowed the respectively broad claims originally prosecuted. However, there is nothing in the prior art or the prosecution history of the patents in suit which would preclude this Court from applying the doctrine of equivalents to reach the corresponding elements shown in the accused devices. The unimportant and insubstantial changes in Defendants' devices are the functional equivalents of the elements in the claims at issue which add nothing to take the devices outside the claims.

25. Accordingly, this Court finds that the *Climax* FF 618 machine infringes Claim 3 of the '246 Patent, and that the FF 618 and LFF 1840 machines infringe Claim 1 of the '944 Patent.

26. Plaintiffs have not introduced evidence in response to the Defendants' counterclaim of non-infringement of Claim 1 and Claim 7 of the '246 Patent by either of the accused devices. Thus, this Court concludes that Claims 1 and 7 of the '246 Patent are not infringed by the FF 618 and LFF 1840 flange facers.

27. Similarly, Plaintiffs have not introduced evidence in response to the Defendants' counterclaim of non-infringement of Claim 3 of the '246 Patent by the LFF 1840 flange facer. Thus, this Court concludes that Claim 3 of the '246 Patent is not infringed by the LFF 1840 flange facer.

*Damages*

28. The only limitation on this Court with respect to the assessment of damages is that the award must be "adequate to compensate for the infringement," and cannot be "less than a reasonable royalty." 35 U.S.C. § 284. In *Railroad Dynamics, Inc. v. A. Stuki Co.,* 727 F.2d 1506 (Fed. Cir.1984), the court distinctly stated, in interpreting section 284, that a reasonable royalty provides only the floor beneath which a damage award must not fall.

29. There are, however, two methods by which damages may be calculated under section 284. Where the record permits a reasonable calculation of a patent owner's actual damages, namely, lost profits, the court in its discretion may award actual damages. After weighing the evidence, this Court determines that the proper measure of damages should be computed in this case on a lost profit basis.

30. To support an award based on lost profits, the Plaintiffs have presented affirmative evidence on the relative factors which were outlined in *Central Soya, Inc. v. George A. Hormel & Co.,* 723 F.2d 1573, 220 U.S.P.Q. 490, 494 (Fed.Cir.1984), *citing, Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978). Thus, this Court has conducted the required market analysis and has determined the following factors: (1) the demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) the Plaintiffs' production and marketing capacity to meet the demand, and (4) the computation of Plaintiffs' lost profits. *Seattle Box Co. v. Indus. Crating & Packing, Inc.,* 756 F.2d 1574, 1581 (Fed. Cir.1985).

31. "While lost profits need not be established by scientific accuracy, conjecture alone is not sufficient." *Baumstimler v. Rankin,* 677 F.2d 1061 (5th Cir. 1982). Although Plaintiffs are not required to eliminate every remote possibility, they must show that but for the infringement it may be reasonably assumed that they would have made the sales made

by the Defendants. *Hughes Tool Co. v. G.W. Murphy Indus., Inc.*, 491 F.2d 923, 930 (5th Cir.1973).

32. As in the instant action, a patent holder can most commonly prove lost profits "when the parties involved in the action are the only suppliers" in the relevant market. *Paper Converting Machine v. Magna-Graphics*, 745 F.2d 11, 21 (Fed.Cir.1984) *citing, Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065, 219 U.S.P.Q. 670, 675 (Fed.Cir.1983).

33. In addition to lost profits, prejudgment interest is also appropriate in the present case. As the Supreme Court admonished in *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983), "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award ..."

34. Plaintiffs are not entitled to increased damages under 35 U.S.C. § 284 because Defendants have not willfully or wantonly infringed the patents in suit. Willfulness or bad faith should not be assumed where the possibility of infringement is open to honest doubt such as when the accused infringer has sought the opinion of patent counsel and been advised that the claims asserted against him are invalid. *Wilden Pump & Engineering Co. v. Pressed & Welded Products Co.*, 655 F.2d 984, 989 (9th Cir.1982).

35. An award of attorneys' fees pursuant to 35 U.S.C. § 285 is authorized only in exceptional circumstances, a standard which demands even more egregious misconduct than that required for an award of increased damages. *Saturn Mfg. v. Williams Patent Crusher & Pulverizer Co.*, 713 F.2d 1347, 1358 (8th Cir.1983). Thus, Plaintiffs are not entitled to an award of attorneys' fees in this case.

### Injunctive Relief

36. Pursuant to 35 U.S.C. § 283, Plaintiffs are entitled to an injunction prohibiting Defendants from further infringing the patents in suit.

### Conclusion

37. This Court concludes that Patent Nos. 3,762,246 and 3,772,944 are valid and enforceable. This Court further concludes that Claim 3 of the '246 Patent is infringed by the accused FF 618 flange facing device, that Claim 1 of the '944 Patent is infringed by the accused FF 618 and LFF 1840 flange facing devices, and that Plaintiffs are entitled to actual damages in the amount of eleven million, five hundred and ninety-nine thousand and twenty dollars ($11,599,020.00), lost profit and prejudgment interest.

38. This Court further sets post-judgment interest on the judgment at ten percent (10%).

39. It is ORDERED that Defendant Climax Manufacturing and Reflange, Inc., their officers, agents, servants and employees, and those persons in active concert or participation with them, who receive notice hereof, are hereby permanently enjoined and restrained from directly or indirectly infringing or inducing infringement of Claim 3 of Patent No. 3,762,246, and Claim 1 of Patent No. 3,772,944, by making, using, or selling, or causing to be made, used or sold, flange facing machines covered by such claims, and any infringing equivalents thereof.

40. In the event the foregoing Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact they are adopted as such. It is so ORDERED.